UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Cheryl Hood, | § |
| | § |
| *Plaintiff,* | § |
| | § Case No. 4:21-cv-02368 |
| v. | § |
| | § |
| Kilolo Kijakazi, Acting | § |
| Commissioner of Social Security, | § |
| | § |
| *Defendant.* | § |

## MEMORANDUM AND RECOMMENDATION

This dispute over social security disability benefits was referred to the undersigned judge. Dkt. 17. After carefully reviewing the parties' cross-motions for summary judgment, Dkts. 18, 19-2,[1] responses, Dkts. 19-2, 21, the administrative record, Dkt. 15, and the applicable law, it is recommended that Defendant Kilolo Kijakazi's motion for summary judgment be granted and that Plaintiff Cheryl Hood's motion for summary judgment be denied.

## Background

Hood worked as a physician assistant for eighteen years after obtaining a Bachelor's degree and graduating in 1998 from a three-year program for physicians assistants. R.1030 (Dr. Hirsch report, 9F).

---

[1] Defendant requested and was granted leave to file its combined motion for summary judgment and response to Plaintiff's motion. Dkt. 20.

Hood was diagnosed with relapsing-remitting multiple sclerosis in 1999. *Id.* According to Hood, her condition worsened after sustaining a concussion during a car accident in April 2016. R.54; R.540 (Apr. 2016 notes regarding the accident). She describes suffering from fatigue and impairment in her ability to walk. R.48-49, 51. Hood also complains of being unable to grip, R.48-49, to walk, stand, or sit for longer than a few minutes at a time, R.49-50, and to cook or to clean her house, R.48-49. Hood also asserted that she rarely drives, has frequent headaches, has difficulty concentrating or maintaining activities, and sleeps and cries a lot. R.52, 55-56.

In July 2019, Hood filed an application for disability benefits, alleging a disability onset date of April 15, 2016. R.128. Her application was denied initially and again upon reconsideration. R.140, 150. At her request, R.159, Hood was granted a hearing before an administrative law judge ("ALJ"), which occurred in October 2020. R.37-63 (hearing transcript).

The ALJ issued a decision that applied the five-step framework for disability claims and concluded that Hood did not qualify as disabled under the Social Security Act. R.15-32. Upon finding that Hood met the insured status requirement, the ALJ concluded at step one that Hood had not engaged in substantial gainful activity since the alleged onset date of April 15, 2016. R.18. For steps two and three, the ALJ found that Hood suffers from several severe impairments—multiple sclerosis, traumatic brain injury, neurocognitive

disorder from traumatic brain injury, spondylosis and disc protrusion of cervical the spine—but that those impairments, either singly or in combination, do not met or medially equal the severity of any listed impairment, such that she would qualify as presumptively disabled. R.18-19.

As a predicate to steps four and five of the analysis, the ALJ formulated Hood's residual functional capacity ("RFC"). R.21. Under the RFC, the ALJ found that Hood can perform light work, except that she (1) cannot "climb ladders, ropes or scaffolds; [(2)] can occasionally climb stairs and ramps, balance, stoop, kneel, crouch and crawl"; (3) "must avoid work having to walk on uneven terrain"; and (4) cannot "work in bright lights such as direct sunlight or strobe lights"; and (5) cannot "work around loud noise, such as construction sites or heavy traffic." R.21.

To account for Hood's mental limitations, the RFC further specifies that Hood "can understand, remember and apply information ... to carry out simple instructions and to perform simple tasks"; "can concentrate, keep pace and persist for two-hour periods with customary breaks during an eight-hour workday"; and "must avoid fast-paced production work[.]" But the RFC provides that Hood "can frequently interact with supervisors, coworkers, and the general public" and "respond appropriately to changes" and "accept instructions and make decisions in a routine work setting." R.21-22.

The ALJ's decision discusses Hood's longitudinal medical record in detail, including findings and opinions of medical sources and state agency consultants that informed the RFC. R.21-30. Notably, the ALJ identified numerous records reflecting that Hood routinely engaged in activities that were not consistent with her allegations regarding the intensity, persistence, and limiting effects of her symptoms. *See* R.22-23, 28. The ALJ also walked through treatment and progress notes beginning with Hood's MRI results in May 2016, after her April 2016 car accident, detailed various treatment notes from numerous medical providers through September 2019. R.24-29.

Relying on those records and findings, the ALJ concluded that Hood's physical limitations do not "warrant restrictions beyond the range of limited light exertional work" specified in the RFC and her mental conditions do not "suggest [Hood] is unable to perform simple, unskilled light and sedentary work activities." R.27. In addition, the ALJ analyzed the consistency and supportability of the opinions and findings of relevant medical opinions and state agency medical consultants. R.28-29. The ALJ found persuasive the findings of state agency consultants and of a consultative examiner, Dr. Raymond Alexander, which indicated that Hood could perform light work. R.28. As for an opinion from another examiner, Dr. Victor Hirsch, that Hood would have difficulty completing work in a timely manner and providing consistent effort, the ALJ deemed the opinion unpersuasive because of

4

inconsistencies with Dr. Hirsch's other findings and Hood's medical records. R.28-29. The ALJ further rejected an opinion from Dr. Jenny Lai that Hood cannot work, finding it to be conclusory and unsupported by other medical evidence, including notes from Dr. Lai's prior treatment of Hood. R.29. In addition, the ALJ rejected the assertions in a function report from Hood's husband because it contradicted evidence in Hood's medical records. *Id.*

Applying the RFC, the ALJ found at step four of the analysis that Hood cannot perform any past relevant work. But at step five, the ALJ found that Hood can perform jobs that exist in significant numbers in the national economy, including office helper, mail clerk, parking lot attendant, cashier, call out operator, document preparer, and information clerk. R.30-31. Therefore, the ALJ concluded that Hood is not disabled. R.31.

The Appeals Council denied Hood's request for review of the ALJ's decision, rendering it final. R.1. Hood then sought review in this Court pursuant to 42 U.S.C. § 405(g). Dkt. 1.

## **Legal Standard**

A reviewing court assesses the Commissioner's denial of social security benefits "only to ascertain whether (1) the final decision is supported by substantial evidence and (2) whether the Commissioner used the proper legal standards to evaluate the evidence." *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016) (per curiam) (internal quotation marks omitted). "Substantial

evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is "more than a scintilla, but it need not be a preponderance." *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012) (quoting *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995)).

When conducting its review, the Court cannot reweigh the evidence or substitute its judgment for the Commissioner's. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). "Conflicts of evidence are for the Commissioner, not the courts, to resolve." *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). But judicial review must not be "so obsequious as to be meaningless." *Brown*, 192 F.3d at 496 (quotations omitted). The court must scrutinize the record as a whole, taking into account whatever fairly detracts from the weight of evidence supporting the Commissioner's findings. *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986).

## Analysis

### I. Legal framework

"The Commissioner uses a sequential, five-step approach to determine whether a claimant is ... disabled: (1) whether the claimant is presently performing substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment;

6

(4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from performing any other substantial gainful activity." *Morgan v. Colvin*, 803 F.3d 773, 776 (5th Cir. 2015) (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)) (footnote omitted). Before moving from step three to four, the ALJ determines the claimant's residual functional capacity, which is used to evaluate steps four and five. *Id.* at 776 n.2 (quoting 20 C.F.R. § 404.1520(a)(4)).

"Under this five-step approach, if the Commissioner determines at a prior step that the applicant is or is not disabled, the evaluation process stops ...." *Id.* at 776 (citing 20 C.F.R. § 404.1520(a)(4)). The claimant bears the burden of proof at the first four steps. *Kneeland v. Berryhill*, 850 F.3d 749, 753 (5th Cir. 2017). At the fifth step, the burden of proof shifts to the Commissioner "to establish the existence of other available substantial gainful employment that a claimant can perform." *Id.* at 753-54.

## II. Substantial evidence supports the RFC.

Hood's sole contention is that the ALJ erred in formulating the RFC, which she claims was prejudicial to the determination that she is not disabled. Dkt. 18 at 4-13. Hood maintains that her mental and physical impairments foreclose her ability to perform light work or even sedentary work. *Id.* at 4-5. Hood's selective reference to her medical records, however, *id.* at 6-7, is inconsistent with this Court's obligation to examine "the record as a whole,"

7

*see Greenspan v. Shalala*, 38 F.3d 232, 240 (5th Cir. 1994), and defer to the ALJ's resolution of conflicting evidence, *see Perez*, 415 F.3d at 461. But as discussed below, the ALJ properly reviewed the entirety of Hood's records, which reasonably support the RFC.

### A. The ALJ did not rely on his own unsupported opinion regarding the impact of Hood's mental limitations.

Hood claims that the ALJ improperly based the RFC on only portions of Dr. Hirsch's opinion that addressed Hood's mental limitations, without providing adequate reasoning to reject the rest. Dkt. 21 at 2. According to Hood, the ALJ did "not adopt any of the given medical opinions," such that the failure to obtain another expert to evaluate Hood's mental limitations left the ALJ with insufficient evidence to formulate the RFC. *Id.* at 2-3; *see also* Dkt. 18 at 5-7 (arguing that Hood's neurocognitive disorder rendered her unable to perform light work, even with limitations specified in the RFC).

Hood's complaints about the ALJ's approach to Dr. Hirsch's opinions are flawed. As Hood concedes, "the ALJ was not required to adopt [Dr. Hirsch's] opinion wholesale ...." *Traylor v. Comm'r of Soc. Sec.*, 2022 WL 8289171, at *7 (S.D. Tex. Aug. 17, 2022), *report and recommendation adopted*, 2022 WL 4104021 (S.D. Tex. Sept. 8, 2022); *see also* Dkt. 21 at 2. Indeed, for claims like Hood's that were filed after regulations specify that ALJ's do not "give any specific evidentiary weight, including controlling weight, to any medical

8

opinion(s) ..., including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a); *see also Benavides v. Saul*, 2022 WL 4287645, at *4 (S.D. Tex. Aug. 4, 2022) (emphasizing this change to the regulatory standard), *report and recommendation adopted*, 2022 WL 3701170 (S.D. Tex. Aug. 26, 2022). Rather, the persuasiveness of a given medical opinion depends most critically on its "supportability" and "consistency." *See* 20 C.F.R. § 404.1520c(b)(2) (characterizing supportability and consistency as "the most important factors"). The "supportability" factor examines the relevance of the "objective medical evidence and supporting explanations presented" by the source. *Id.* § 404.1520c(c)(1). For the "consistency" factor, an opinion's persuasiveness depends on how closely it tracks "evidence from other medical sources and nonmedical sources in the claim ...." *Id.* § 404.1520c(c)(2).

Here, the ALJ explained precisely why she deemed unpersuasive Dr. Hirsch's ultimate opinion that Hood "would have some difficulty completing functional activities in a timely manner and providing consistent effort in work-related activities." R.28-29. As the ALJ noted, the results of Dr. Hirsch's mental examination of Hood were unremarkable. R.28; *see also* R.1030-31 (noting that Hood' had "goal-directed" thought process; no perceptual abnormalities; appropriate mood and affect; "a normal level of remote, recent, and immediate memory abilities," "normal levels of concentration and attention"; good judgment; and good insight). The ALJ also cited the results of

9

various tests performed by Dr. Hirsch. R.28-29. Nearly all the test results, the ALJ noted, fell within the low-average-to-average range except for certain aspects of her memory. R.28; *see also* R.1032-33 (low average for verbal comprehension and processing speed, average for perceptual reasoning, extremely low for working memory, low average for cognitive function, borderline for auditory memory, extremely low for visual immediate, immediate memory, and delayed memory). Yet the ALJ emphasized that testing also reflected that Hood had no real difficulty with academic achievement, falling at the 12th grade level. R.28; R.1039 (Hood's test results reflected average to high-average range of academic achievement). Moreover, Dr. Hirsch himself observed that Hood exhibited normal levels of concentration and attention during the meeting, the ability to count by 7's up to 56 and count backwards from 100 by threes, and good judgment. R.29; R.1039 (noting that psychosocial was "[u]nremarkable").

The ALJ also emphasized Hood's ability to "perform[] a wide range of activities of daily living," as reflected in Dr. Hirsch's own assessment and elsewhere in Hood's medical records. R.29; *see also* R.1029 (Dr. Hirsch's report). Dr. Hirsch's own report states that Hood takes her kids to school and picks them up, shops with friends, cooks meals, bathes and dresses herself, drives herself around (including driving the 30-mile trip, alone, to Dr. Hirsch's office, R.1028), and handles money. R.1029; *see also* R.23 (citing this record as

10

Ex. 9F/3). Other treatment notes reflect that Hood played games with her children and enjoys baking. R.623 (Sept. 2016 note); R.730 (notes Apr. 29, 2016, June 19, 2017, Dec. 18, 2018); *see also* R.23 (citing these records as Ex. 4F/58, 9F/29). In November 2016, Hood was working a light duty position at Methodist Hospital, three days a week. R.658; *see also* R.23 (citing this record as Ex. 4F/93). Subsequently, Hood helped her husband with his construction company. R.734 (Feb. 12, 2018 note); *see also* R.23 (citing this record as 8F/33). And as indicated in Dr. Hirsch's report, R.1029, Hood also was heavily involved with volunteering at a food pantry. *See* R.733 (Dec. 18, 2018 note, Dr. Lai, noting Hood's heavily involvement for past two months). These activities, the ALJ explained, are inconsistent with Hood's own testimony and Dr. Hirsch's conclusion about the limiting effects of her conditions. *See* R.23; *see also* R.28.

Significantly, too, treatment and progress notes indicate that Hood had made significant strides in her cognitive function through various therapy sessions. *See* R.592 (referral for treatment); R.24-26 (ALJ discussing the medical records). In August 2016, Hood could "complete[] cognitively demanding tasks for more than 30 minutes without requiring a break." R.606. The next month, she completed alternating attention tasks that switched every four to five minutes, while fielding verbal interruptions, and did so at a 90% accuracy rate with additional time to complete the tasks. R.613. Her speech had also significantly improved, and by October 3, 2016, she had met all

11

cognitive goals while also working part-time, notwithstanding complaints about short-term memory issues. R.565; R.676 (Hood disclosed that "neuropsychological testing [in] July and October" of 2016 "showed improvement" although she complained of "ongoing short term memory loss"). In fact, in December 2016, Hood was working light duty for thirty hours a week. R.658. But after receiving a letter in late 2017 indicating that she no longer qualified for long-term disability, Hood stated that she "now does not have a desire to return to work." R.679 (Nov. 1, 2017 notes).

A neuropsychological evaluation in December 2018 found that Hood had "significant improvements on all tasks that were impaired in July 2016"; had only mild difficulty on one task (semantic fluency) that Hood related to fatigue; had only mild issues from post-concussion syndrome, including sensitivity to light and sound and some fatigue; and was otherwise managing well with medication. R.736. The report states that the "[r]esults suggested that [Hood] could return to work" just as she had started to do. R.736.

Based on all the foregoing information, the ALJ found that Dr. Hirsch's ultimate opinion was both inconsistent with his own findings and unsupported by other information in the record. There is a "discernible 'logic bridge' between the evidence and the ALJ's persuasiveness finding" about Dr. Hirsch's opinions. *See Pearson v. Comm'r of Soc. Sec.*, 2021 WL 3708047, at \*5 (S.D.

12

Miss. Aug. 11, 2021), *report and recommendation adopted*, 2021 WL 3663073 (S.D. Miss. Aug. 18, 2021).

Moreover, contrary to Hood's position, Dkt. 21 at 2, the ALJ did embrace other expert opinions that supported the RFC—in particular, those of state agency medical consultants. R.28. The consultants concluded that Hood "can understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in the work setting. R.78 (initial opinion); R.110 (reconsideration). Their opinions, which the ALJ could properly adopt, dovetail with the RFC. *See* R.21 (specifying that Hood "can understand, remember and apply information ... to carry out simple instructions and to perform simple tasks"; "can concentrate, keep pace and persist for two-hour periods with customary breaks"; "can frequently interact with supervisors, coworkers, and the general public; and "can respond appropriately to changes in ... and accept instructions and make decisions in a routine work setting"); *see, e.g.*, *White v. Kijakazi*, 2022 WL 784480, at *7 (S.D. Tex. Mar. 15, 2022) (noting that ALJ may "in her discretion rely on the state agency consultants' opinions in formulating the RFC").

In sum, the ALJ articulated a reasonable basis for rejecting Dr. Hirsch's conclusion, crediting other consultants' opinions, and formulating an RFC that accounts for Hood's mental limitations that the ALJ found were substantiated

13

by the record as a whole. That determination was for the ALJ alone to make. *See Taylor*, 706 F.3d at 602-03 ("Under the regulations and our case law, the determination of [RFC] is the sole responsibility of the ALJ."). Substantial evidence supports the RFC.

### B. The ALJ properly accounted for Hood's physical limitations in the RFC.

The ALJ also detailed the medical records and medical opinions indicating that Hood can meet the physical demands of performing light work, subject to the limitations specified in the RFC. R.22-28. The ALJ also explained why Hood's self-described limitations, as well as the function report prepared by her husband, were inconsistent with the record evidence. R.23, 29-30. And the ALJ deemed unpersuasive a "check box"-style functional capacity report from Dr. Lai as both conclusory and inconsistent with Hood's records as a whole. R.29. Although Hood disputes these findings, emphasizing her multiple sclerosis, right foot drop, and prior brain injury, her arguments impermissibly invite this Court to reweigh the evidence. *See* Dkt. 18 at 5-11.

First, Hood ignores the records discussed in the ALJ's opinion that formed the basis for the RFC. After Hood's car accident in April 2016—which corresponds with the claimed onset of her disability, R.15—she underwent an MRI of her brain and spine. *See* R.669-70. The results were similar to those from an October 2014 MRI, noting moderate cerebral demyelinating disease

14

without evidence of acute abnormalities, cervical spondylosis and disc protrusions with mild canal stenosis but no cord compression, and no significant foraminal stenosis. R.670. There were mild to degenerative changes noted in Hood's lumbar spine, but without spinal canal or foraminal stenosis. *Id.* According to the notes, Hood's multiple sclerosis was "stable" with medication. R.669.

In June 2016, Hood's doctor noted that Hood had post-concussive syndrome due to the car accident but found no evidence that her multiple sclerosis had changed. R.672. As of August 2016, Hood was already driving, and medical professionals determined that she did not require occupational therapy. R.577 (Aug. 2, 2016). The record reflects that the strength in her extremities was within normal limits and her grip strength was functional with some deficits.

As noted above, by late October 2016, Hood was working several days a week. R.658. In December, she was working a light duty position thirty hours a week. R.658. The same month, another MRI showed that her cervical spine and brain were stable. R.676 (Feb. 9, 2017 note about Dec. 2016 MRI).

Shortly thereafter, Hood was diagnosed with a right foot drop, which was addressed with a Bioness device that improved her gait. *Id.* When Hood returned to her doctor in November 2017, she complained of fatigue—for which she was taking Ritalin—and memory issues but denied having any weakness

15

or numbness. R.679. A few months later, records again noted that Hood had no symptoms suggesting that her multiple sclerosis had relapsed. R.681 (May 2, 2018 note). Her gait was normal. R.682. She was still taking Ritalin for fatigue, *id.*, with "good results," R.733 (May 14, 2018 note, Dr. Lai); R.811 (same). Hood had "no evidence of foot drop" and was "able to toe and heel walk with good balance." R.735 (May 14, 2018 note).

In September 2018, Hood complained of worsening neck pain over the previous few months but had only taken over-the-counter medication to address it. R.772 (Dr. Lai). She was then prescribed Duexis. R.775. When she complained of fatigue in December 2018, the doctor noted that Hood's heavy involvement at the food pantry during the prior two months "may be contributing to her fatigue." R.733, 737 (Dec. 18, 2018 note, Dr. Lai).

The ALJ also relied on the findings of a consultative medical examiner, Dr. Raymond Alexander, who evaluated Hood on September 11, 2019. R.26, 28; R.1037-40. As the ALJ noted, R.26, 28, Dr. Alexander found that Hood's ability to move and lift, carry, and handle objects is compromised, and that she has some chronic neck pain and decreased strength in her right foot. R.1040. He also found Hood's gait to be somewhat unsteady. *Id.* But Dr. Alexander found no deficits in Hood's grip strength and ability to reach, handle, finger and feel. *Id.* Notably, Dr. Alexander found no atrophy, no dermatomal motor or sensory findings, no reflex abnormalities, no joint deformities, and no

16

disorganization of motor function. R.1040. There was also no reproducible fatigue of motor function or muscle weakness on repetitive activity. *Id.* The ALJ concluded these findings did not foreclose an RFC that permitted Hood to perform light and sedentary work with some additional limitations to account for her conditions, particularly given the other evidence detailed above. R.28.

The ALJ also considered and rejected, as conclusory and inconsistent with other record evidence, a check-the-box opinion from Hood's treating physician, Dr. Jenny Lai. R.29 (rejecting R.1042-47). With no explanation, Dr. Lai's form states that Hood cannot perform even low-stress jobs, can only rarely lift ten pounds, cannot stand more than twenty minutes at a time, can only sit for two hours in an eight-hour workday, and categorically is "not able to work." R.1044-47. The lack of explanation, alone, provided a sufficient reason for the ALJ to deem Dr. Lai's opinion unpersuasive. *See, e.g.*, *Connor v. Saul*, 2020 WL 4734995, at *6 (S.D. Tex. Aug. 15, 2020) (physician's "check-box form with almost no explanation[] is precisely the type of conclusory opinion that need not be afforded controlling weight") (collecting authorities).

Moreover, the ALJ noted that key aspects of Dr. Lai's findings conflicted with Dr. Alexander's well-supported findings. Unlike Dr. Alexander, Dr. Lai found that Hood does have disorganization of motor function in two extremities. *Compare* R.1040, *with* R.1043; *see also* R.29 (noting this conflict). Also unlike Dr. Alexander, Dr. Lai indicated that Hood is significantly limited

17

in her ability to reach, handle, or finger. *Compare* R.1040, *with* R.1046; *see also* R.29 (noting this conflict). As the ALJ concluded, Dr. Lai's unexplained findings are inconsistent with Hood's own representations to Dr. Alexander about the "very full array of activities of daily living" that she can perform. R.29. Some of those activities—like Hood's volunteering at the food bank and helping with her husband's construction company—are reflected in Dr. Lai's own treatment notes. R.29 (making this point); *see* R.733-34 (Feb. 12, 2018 and Dec. 18, 2018 notes). And despite Hood's focus on her own testimony, Dkt. 18 at 8—which the ALJ discussed, R.22—contrary information in the medical records provided the ALJ a reasonable basis for rejecting Hood's subjective description of the "intensity, persistence and limiting effects of [her] symptoms." R.28; *see also* R.23; Part II.A, *supra*.

The ALJ therefore adequately explained how she determined that Dr. Lai's opinion was unpersuasive, how Dr. Alexander's findings supported the RFC as formulated, and what other medical evidence informed the RFC. At best, Hood has identified conflicts in the evidence that were reserved for the ALJ to resolve. *See Perez*, 415 F.3d at 461. The ALJ's decision should be affirmed.

## Recommendation

For the foregoing reasons, it is **RECOMMENDED** that Defendant's motion for summary judgment (Dkt. 19-2) be **GRANTED**, that Plaintiff's motion for summary judgment (Dkt. 18) be **DENIED**, and that the ALJ"s decision be **AFFIRMED**.

The parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error. *Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 825 (5th Cir. 2015).

Signed on March 3, 2023, at Houston, Texas.

*Yvonne Y. Ho*
Yvonne Y. Ho
United States Magistrate Judge